No. 115,023

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARK BYERS,
*Appellant*,

v.

ACME FOUNDRY,
*Appellee*.

SYLLABUS BY THE COURT

1.

Appellate courts have unlimited review of questions involving the interpretation or construction of a statute, owing no deference to an agency's or Board's interpretation or construction.

2.

In the Workers Compensation Act, K.S.A. 2012 Supp. 44-501 sets out in its subsections several reasons why an injured worker would forfeit compensation benefits. All of the forfeitures come from actions taken by the employee, such as: deliberately causing an injury; willfully failing to use a guard or protective device; recklessly violating the workplace safety rules; voluntarily participating in fighting or horseplay; and refusing to comply with an employer's postinjury drug test.

3.

The term "refusal" as it is used in K.S.A. 2012 Supp. 44-501(b)(1)(E) carries with it an element of willfulness or intent.

1

4.

An insufficient urine sample, without evidence of an intent to thwart the purpose of a drug test, is not a refusal to submit to drug testing as used in the Workers Compensation Act.

Appeal from Workers Compensation Board. Opinion filed January 27, 2017. Reversed and remanded with directions.

*William L. Phalen*, of Pittsburg, for appellant.

*Paul M. Kritz*, of Hall, Levy, Devore, Bell, Ott & Kritz, P.A., of Coffeyville, for appellee.

Before HILL, P.J., BUSER and LEBEN, JJ.

HILL, J.: In this workers compensation case, where there is no hint of alcohol or drug use by an injured worker, the administrative law judge and the Workers Compensation Board ruled that Mark Byers refused to comply with a postinjury urine testing policy of his employer, Acme Foundry, by giving an insufficient urine sample. The ALJ and Board ruled that Byers forfeited all of his rights to compensation based on their reading of K.S.A. 2012 Supp. 44-501(b)(1)(E). We disagree with that interpretation and hold that Byers' actions did not amount to a refusal. We reverse and remand to the ALJ for a determination of any applicable benefits.

*Injured at work, Byers went to the hospital and then returned to the foundry.*

The facts are thoroughly set out in the Board's opinion, and we offer only a brief summary.

Byers worked as a grinder at Acme Foundry. In May 2013, Byers began work at 4 a.m. and, at approximately 5:20 a.m., Byers' left arm was injured. He was "grinding on a

2

piece of metal and something struck [him]." Byers was examined by an EMT onsite and then taken to the emergency room at Coffeyville Regional Medical Center. He was admitted at 6 a.m. and complained of severe pain in his left elbow. He underwent a physical examination, an x-ray, and an MRI. Byers testified the hospital took a blood sample from him. Notes in Byers' medical records indicate that the hospital lab was notified of the need for a workers compensation drug screen. The lab called the foundry to find out what type of drug screen it wanted. The foundry replied that it did not need a drug screen.

Byers was released from the hospital and started walking back to the foundry. Jody Stritzke, Acme's in-house nurse, picked him up a couple of blocks from the hospital at 2:20 p.m. Stritzke testified that Byers seemed agitated when she picked him up. Byers told her that "he wasn't doing very good, that he'd been there all day and he was sick and tired of questions being asked to him and he was ready to get away from everyone." Stritzke told him that he needed to take a drug test when they got back to the foundry. Byers acted perturbed, asking why they did not do it at the hospital. But he agreed to the drug test. He did not appear to be intoxicated. The foundry had a company policy permitting postaccident drug testing of employees.

Stritzke asked Byers if he was given any work restrictions, and he tossed his paperwork to her. Stritzke began to look through his paperwork back in her office, but Byers interrupted, "I thought we were going to do this drug test." Byers was close to tears and said he "was ready to go home." Stritzke then called Jane Hughes and asked her to witness the test. Byers was cooperative and agreed to the drug test.

Strizke testified that she has worked at the foundry for 17 years and is in charge of its UA program. Stritzke used a One Step Onsite drug cup to conduct Byers' drug test. The collection cup is a self-contained drug test. Stritzke testified that she explained to Byers that he needed to provide a urine sample above the temperature gauge on the cup,

3

pointing to the black and white strip on the cup. She explained that the temperature gauge had to turn green or she could not use the sample. She showed him where it said 30 milliliters on the cup and explained that she needed at least 30 milliliters or she could not use the urine sample.

Hughes also testified that Stritzke told Byers the urine needed to be above the temperature strip and that the sample could not be used if they did not get a temperature reading. Byers cooperated and took the cup. When finished, he set the cup on the cabinet as instructed and headed for the door. Hughes testified that Byers had done everything he was asked to do at this point.

Stritzke picked up the cup, tilted it sideways, and said, "Jane, there's not enough in the cup and I'm not getting a . . . temperature reading." Stritzke and Hughes testified that Byers urinated to the bottom of the black line. Stritzke testified that Byers then picked up his hard hat and said "see you ladies later." Stritzke said, "[W]ait, sir . . . we're not finished with the test." Byers walked out the door, and Stritzke followed him and said "please don't leave, please don't go, you can lose your job if you don't finish your drug test." Stritzke went back into the building and immediately threw Byers' urine sample into the trash.

Stritzke testified that it is not unusual for a test cup to fail to register a temperature. Typically, she tries another cup or waits until the person can use the restroom again. Stritzke performs at least 24 drug tests a month and approximately 3 times a month the temperature gauge does not appear to work and she pours the sample into another cup to get an accurate temperature reading. Stritzke did not pour Byers' urine sample into another cup to attempt to get a reading. She acknowledged it was not unusual for a cup to be defective but testified that she needed Byers' consent to pour the urine into a different cup.

4

Jason Zimmerman, the foundry's director of human resources, testified that there was no indication that Byers was under the influence of drugs or alcohol the day of the accident. Zimmerman told Stritzke to cancel Byers' appointment with an orthopedic surgeon because he did not complete the drug test. Byers called Zimmerman the day after the accident regarding the cancelled appointment. Zimmerman testified that Byers told him, "[Y]ou would have refused to take it too." Zimmerman testified,

> "I asked him why he had refused and he said he had been there all day and just didn't want to do it, didn't want to take the test, and he was going home and I would have done the same thing in his shoes. And I told him that I wouldn't have, I would have complied with the drug test. And at that point he said so what you are telling me is that I'm terminated and I said I'm not saying that, I wanted to visit with you about why you didn't take the, or complete the drug test and he told me well, I'll just take it as I'm terminated and you will talk to my lawyer and hung up the phone."

Byers denied that he told Zimmerman he had refused the test.

*Both the ALJ and the Board rule that Byers refused the test.*

The ALJ concluded that Byers forfeited his benefits under the Workers Compensation Act by providing an inadequate urine sample for testing, citing K.S.A. 2012 Supp. 44-501(b)(1)(E). The Board upheld that ruling.

*We are not bound by the administrative body's interpretation of this law.*

Appellate courts have unlimited review of questions involving the interpretation or construction of a statute, owing no deference to the agency's or the Board's interpretation or construction. *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013); *Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 193, 364 P.3d 571 (2015).

The statute in question is K.S.A. 2012 Supp. 44-501(b)(1)(E), which provides:

> "An employee's refusal to submit to a chemical test at the request of the employer shall result in the forfeiture of benefits under the workers compensation act if the employer had sufficient cause to suspect the use of alcohol or drugs by the claimant or if the employer's policy clearly authorizes post-injury testing."

It is important to look at the purpose of this statute when interpreting it. Generally, K.S.A. 2012 Supp. 44-501 sets out in its subsections several reasons why an injured worker would forfeit compensation benefits. All of the forfeitures come from actions taken by the employee. For example:

- when an employee deliberately causes an injury, K.S.A. 2012 Supp. 44-501(a)(1)(A);
- when an employee willfully fails to use a guard or protective device, K.S.A. 2012 Supp. 44-501(a)(1)(B) and (C);
- when an employee recklessly violates the workplace safety rules, K.S.A. 2012 Supp. 44-501(a)(1)(D);
- when an employee voluntarily participates in fighting or horseplay, K.S.A. 2012 Supp. 44-501(a)(1)(E).

This subsection, K.S.A. 2012 Supp. 44-501(b)(1)(E), fits in well with the policy created by this law. In the vernacular of the workplace, if you are drunk or stoned on the job, do not expect workers compensation benefits when you are injured.

There is not one bit of evidence in this record that suggests that Byers was under the influence of any chemical or alcohol when he was working or when he was injured. In fact, when he was asked at the hospital to give a urine sample, he offered to do so.

6

Only when the foundry told the hospital lab that it would do the urine test, was it not administered.

When he returned to the foundry, Byers gave a urine sample. Stritzke threw it out because she thought it was inadequate. Nothing in the record indicates that she even tried to test it.

From Byers' viewpoint, this was a long day. He went to work at 4 a.m. and was injured around 5:30 a.m. He was transported to the hospital for care and treatment, where he received three injections for the pain he was experiencing. Byers waited at the hospital and then started walking back to the foundry. Sometime after his return, still in pain, he was asked to give a urine sample, which he did. Then, on his way out he was asked to give another urine sample which he did not do, and then he went home.

The next day, when asked by the foundry's representative why Byers refused, using the term suggested by the representative, Byers responded, "[Y]ou would have refused to take it too." We do not view this as an admission.

Precedent teaches us that the term "refusal" as it is used in the statute carries with it an element of willfulness or intent. *Neal v. Hy-Vee, Inc.* 277 Kan. 1, 16, 81 P. 3d 425 (2003). Were Byers' actions done with the intent to thwart the foundry's drug testing policy? We think not. Had he wanted to do that, Byers would have tried to avoid drug testing at the hospital.

Here, the ALJ expressly held that "Claimant refused to comply with Respondent's post-accident testing policy by giving an inadequate urine sample to allow testing." In affirming this, the Board held, "While claimant produced some urine for respondent, his actions demonstrate a refusal to submit to a chemical test."

The ALJ and the Board ordered the forfeiture of compensation benefits to an injured worker simply based on their view that an inadequate urine sample is a refusal to comply with drug testing. In other words, if you give an insufficient sample, you have refused to comply with the test. With such an interpretation, there is no showing of intent as required by the wording of the law. By so holding, they have written into the statute, "by giving an adequate sample." Only the legislature can add words to statutes.

Byers gave his employer a urine sample. His employer threw it out. We do not know if it was inadequate, as it was never tested. Byers did not refuse his employer's postaccident drug test. His workers compensation benefits must not be forfeited. We reverse and remand to the ALJ for further proceedings for a determination of any applicable benefits.

Reversed and remanded.